PROFESSIONAL BUSINESS SERVICES CO., APPELLANT AND
CROSS-APPELLEE, V. STEPHEN J. ROSNO, APPELLEE
AND CROSS-APPELLANT.
680 N.W.2d 176

Filed June 4, 2004.   No. S-02-1227.

Robert R. Otte, of Morrow, Poppe, Otte, Watermeier & Phillips, P.C., L.L.O., for appellant.

Jerry L. Pigsley, of Harding, Shultz & Downs, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## I. NATURE OF CASE

Professional Business Services Co. (PBS) appeals from a judgment of the district court for Lancaster County, Nebraska, finding a noncompetition covenant to be greater than reasonably necessary to protect PBS and, therefore, unenforceable. From this and other findings below, PBS appeals and the appellee, Stephen J. Rosno, cross-appeals.

## II. BACKGROUND

During the relevant time in question, PBS served primarily the health care industry in essentially four areas: taxes, accounting and payroll, practice management, and billing and claims. PBS contracted with the Dale E. Gruntorad Company accounting firm

(Gruntorad) to operate PBS' tax practice area. From approximately 1987 to 1989, Rosno, employed by Gruntorad, performed a majority of PBS' work related to the tax practice area, including preparing all of the tax returns for and providing tax advice to PBS' clients. Rosno performed his work for PBS onsite, but did not have personal contact with PBS clients. PBS heavily relied upon the Gruntorad firm to provide tax services for PBS' business.

When PBS' founder died in 1989, PBS did not have an established client list. Due to his familiarity with PBS' client base, Rosno assisted PBS by preparing an inventory of PBS' clients. Rosno's role at PBS also began to take on more significance as Rosno became more heavily involved with advising clients for tax purposes. Rosno became a partner in the Gruntorad accounting firm and continued to prepare tax returns for PBS' clients.

Between June and September 1992, Rosno approached Steven Strasheim, one of PBS' principals, on several occasions, requesting that PBS hire Rosno as an employee. Initially, PBS rejected Rosno's requests for employment. Rosno told Strasheim that if Rosno left Gruntorad, pursuant to a noncompetition agreement with the accounting firm, the only way Rosno could continue providing services for PBS was to buy PBS' business from Gruntorad, a transaction Rosno explained he could not afford. Thus, PBS eventually agreed to hire Rosno. During the negotiation of Rosno's employment with PBS, Strasheim told Rosno that at that time, only he and his brother, the only other principal of PBS, had the level of professional experience necessary to maintain client relationships. Therefore, they would be looking to Rosno to help in that area. However, Strasheim and his brother also expressed to Rosno their concerns. If they hired Rosno and allowed him to take over the tax practice area, and begin having individual relationships with PBS' clients, Rosno might later leave PBS and take those clients with him. Rosno responded by suggesting the parties execute a noncompetition agreement to protect PBS.

On October 8, 1992, the parties executed a "Professional Employment Agreement" (employment agreement) drafted by PBS' attorney, which included a noncompete covenant. The effective date of the employment agreement was October 1, 1992; the

day Rosno began working as an employee of PBS. At the time the parties executed the employment agreement, the parties made several handwritten changes, which both parties initialed. One such change included a provision that the postterm noncompetition provision of the covenant "shall not apply to clients listed on Exhibit I." Exhibit I lists approximately 95 clients of PBS. The noncompetition covenant of the employment agreement provides:

a. <u>In-Term Covenant</u>: The parties agree that during the term of this Agreement and during the term of Rosno's employment by the Employer, the respective clients of the Employer shall remain the clients of the Employer and that Rosno shall not, directly or indirectly, whether as an officer, director, shareholder, partner, advisor, consultant or employee or in any other capacity do business for or with any client of the employer outside of the scope of duties rendered for Employer pursuant to this Employment Agreement.

b. <u>Post-Term Covenant</u>: Rosno further covenants and agrees that in the event of the termination of his employment, for whatever reason, he shall not directly or indirectly solicit, contact or perform services for any of Employer's clients for his own benefit or as an officer, director, shareholder, partner, advisor, consultant or employee of any third party. Said Post-Term Covenant shall continue for a period of two (2) years following such termination or separation for any reason whatsoever and shall include the area located within twenty-five (25) miles of Lincoln, Nebraska. The post-term covenant shall not apply to clients listed on Exhibit I.

The employment agreement's effective dates were October 1, 1992, to September 30, 1993, and included an option to extend Rosno's employment with PBS on a year-to-year basis. The employment agreement addressed issues related to bonuses, vacation time, and sick leave, and included a provision related to termination of the employment agreement:

3. <u>Salary and Bonuses</u>: . . . .

Employer may pay Rosno a bonus at any time during the term of the Agreement. However, Rosno shall be paid a bonus of $5,000.00 after Rosno's first year of employment.

. . . .

4. Other Benefits: . . . .

. . . .

In addition to the foregoing, Rosno shall receive three (3) weeks of paid vacation per year a[t] such time as may be reasonable given the professional and work related demands of the Employer during the year.

In addition to the foregoing, Rosno shall have the opportunity to participate in any retirement, health insurance or other employee benefit plan offered by the Employer to its employees generally.

. . . .

6. Termination: Employer may terminate this Agreement with Rosno and Rosno's employment by Employer on September 30, 1993, for any reason upon . . . ninety (90) days advanced written notice to employee.

Additionally, Employer may terminate this Agreement and Rosno's employment by Employer at any time, without notice to Rosno for fraud, misrepresentation, theft, malfeasance, or upon the initiation by the Board of Accountancy of any proceedings to revoke or modify the permit to practice public accounting pursuant to the laws of the State of Nebraska..

Additionally, Employer may terminate this Agreement and Rosno's employment on thirty (30) days notice for failure of Rosno to complete his duties as required herein or reasonably requested by Employer.

Rosno may terminate this Agreement, and Rosno's employment hereunder at any time, for any reason, upon ninety (90) days advanced written notice to Employer.

The employment agreement also contained a provision prohibiting Rosno from using, directly or indirectly, for his own benefit, PBS' trade secrets. These included customer lists or other business operation information deemed by PBS to be secret and held in confidence.

On Friday, November 10, 1995, Rosno gave Strasheim a handwritten notice of termination of the employment agreement. At the time Rosno presented his notice terminating the employment agreement, Strasheim described Rosno as being

very hostile and stated that Rosno was threatening to make disparaging remarks about PBS. Rosno refused to say why he was resigning, but told Strasheim that "his feeling was our employment agreement was not valid and that he would be asking any PBS client he wanted to leave PBS and follow him to his new accounting firm." Strasheim asked Rosno to take the weekend to reconsider his position in that it was grounds for immediate termination. Strasheim met with Rosno the following Monday, at which time, Rosno gave Strasheim a list of clients whom Rosno believed he was entitled to, and intended to, solicit. Many of the clients on the list were not those listed on exhibit I attached to the employment agreement. Strasheim testified that Rosno then stated that " 'I'm going to ask anybody I want to follow me to my accounting firm and leave PBS' " and that he was not going to honor the noncompetition covenant of the employment agreement. At that point, Strasheim terminated Rosno's employment and asked him to gather his belongings and leave. Rosno admitted during cross-examination that his intention, had he been permitted to continue working for PBS during his 90-day notice period, was to continue working for PBS while simultaneously taking PBS' clients. Strasheim testified that this was the most hostile resignation he had ever experienced, that he was completely caught off guard by Rosno's attitude, and that there had been no prior warning signs foreshadowing Rosno's resignation. Following Rosno's termination, PBS copied thousands of client records and gave them to Rosno pursuant to record release forms received from Rosno and signed by PBS clients.

PBS originally filed this action alleging breach of the covenant not to compete and claiming damages pursuant to the liquidated damages provision of the employment agreement. The trial court sustained a demurrer filed by Rosno, finding that PBS' petition failed to set forth facts sufficient to constitute a cause of action. Specifically, the trial court found that the noncompete covenant in the employment agreement was more restrictive than reasonably necessary to protect PBS' legitimate interest and, thus, was invalid and unenforceable.

On appeal to this court, we reversed, and remanded with directions to reinstate the operative petition. See *Professional Bus.*

*Servs. v. Rosno*, 256 Neb. 217, 589 N.W.2d 826 (1999) (*Rosno I*). We noted the general rule that a covenant not to compete in an employment contract " 'may be valid only if it restricts the former employee from working for or soliciting the former employer's clients or accounts with whom the former employee actually did business and has personal contact.' " *Id.* at 225-26, 589 N.W.2d at 832. We noted that in its operative petition, PBS alleged that Rosno "had substantial contact with virtually all of PBS' clients." *Id.* at 227, 589 N.W.2d at 833. We also noted that PBS alleged that Rosno "had violated the terms of his contract with PBS by siphoning away PBS' goodwill." *Id.* at 222, 589 N.W.2d at 830. We concluded that the inferences of law and fact from the operative petition were that Rosno was being restricted from working for or soliciting PBS' clients or accounts with whom Rosno actually did business and had personal contact and that in his employment agreement, the covenant not to compete with respect to all of PBS' clients could be enforceable. *Id.* Accordingly, we concluded that PBS should be permitted to present evidence to support the facts. *Id.*

Upon remand, a bench trial ensued and evidence was adduced. Strasheim testified that when Rosno was hired at PBS, he was given the title of "tax specialist," and that PBS hoped Rosno would help the company grow and serve PBS' clients. Around that same time, PBS sent a letter to all of its clients welcoming Rosno to the company and suggesting to clients that they contact Rosno directly with any questions regarding tax or accounting issues. Strasheim testified that during the course of Rosno's employment with PBS, he was involved in PBS' four practice areas of taxes, accounting and payroll, practice management, and billing and claims. Rosno testified, however, that he spent 99 percent of his time in only the taxes, accounting and payroll, and practice management areas.

With respect to the tax practice area, Rosno was responsible for the preparation of every tax return PBS prepared and would have known "quite a bit about a person's life." Rosno was privy to information about client income, expenses, charitable contributions, medical expenses, significant health care issues, business loans, equipment purchases, and would have needed to "understand [a client's] business quite well."

With respect to the other areas of PBS' business, some of Rosno's responsibilities included answering questions from clients and their staff. These questions would be regarding their general ledgers, collecting information from clients to prepare tax returns, and occasionally taking calls from clients regarding billing issues. With respect to the practice management area of PBS' business, Strasheim testified that he began teaching Rosno how to "be sort of a physician specialist." Strasheim also sent him to Kansas City to receive training on how to be a practice management advisor. Strasheim noted that PBS had hired Rosno to supervise the accounting and payroll area, but that this supervisory role never came to fruition for Rosno.

PBS introduced into evidence a series of documents, exhibits 50 through 78, representing correspondence from Rosno to various clients and other documents. Strasheim testified that these exhibits reflect that Rosno had contact with "quite a few clients" and operated in areas other than the tax practice. Specifically, Strasheim testified that exhibits 50 through 78 demonstrated that Rosno was closely involved with PBS' billing practice, was intimately familiar with PBS' billing reports and billing systems, and solicited and marketed PBS' billing services to clients. Rosno testified, however, that he did not provide any services in the billing area of PBS' business. He testified that he did not train clients on their billing system, he did not field billing-related telephone calls, he did not provide any support for the billing system, and he did not engage in computer software development for the computer billing system. Rosno testified that the only involvement he had with PBS' billing and claims practice was in the use and analysis of reports generated by the billing system.

Two sets of client lists, exhibits 42 and 43, were offered by PBS and received into evidence. The parties referred to exhibit 42 as the personal contacts list (PC list) and to exhibit 43 as the list containing those clients who used PBS' billing services only (BO list). Strasheim testified that these two lists combined to make up the complete list of PBS clients at the time that Rosno was terminated.

The PC list contains a list of 359 clients of PBS. This list was produced by PBS in response to an interrogatory requesting that PBS identify those clients with whom Rosno had substantial

personal contact. The PC list contains a list of any client that was billed for accounting, payroll, or income tax services during the period of Rosno's employment with PBS. Strasheim testified that Rosno was the primary client services representative for the areas of accounting and payroll and tax practice. Strasheim testified that Rosno would have had contact with virtually 100 percent of the clients on this list. He would have substantial contact with a majority of the clients on this list either through correspondence, in-person meetings, or telephone calls, or through contact with the information in the clients' accounting and tax files. Rosno testified that with the exception of 10 to 12 clients, he provided tax or accounting services to all of the clients listed on the PC list. However, Rosno further testified that he did not have personal contact with 80 of the 359 clients listed on the PC list.

The BO list is a list of 93 PBS clients and was produced by PBS in response to an interrogatory requesting PBS to identify those clients with whom Rosno did not have substantial personal contact. This exhibit contains a list of the remainder of PBS' clients who were billed during the period of Rosno's employment for services other than accounting, payroll, or income tax work.

Strasheim testified that the clients listed on the BO list were "billing only" clients. Strasheim admitted that Rosno did not have personal contact with 100 percent of the clients listed on the BO list but had personal contacts with only some of the clients listed. Strasheim admitted that he could not prove with which clients on the BO list Rosno did, in fact, have personal contact, because, Strasheim stated, he did not track Rosno's client contacts. Rosno testified that he provided services for only three or four clients listed on the BO list and had personal contact with only two clients on that list.

Exhibit 92, offered and admitted into evidence, consists of copies of the PC and BO lists annotated by Rosno. Specifically, Rosno marked those clients of PBS for whom he provided any type of service or work while employed at PBS, and those clients of PBS for whom he had personal contacts while in PBS' employ. Rosno's annotations indicate he provided services for 4 of the 93 PBS clients listed on the BO list, but did not have personal contact with any of those 4. Rosno's annotations indicate he provided

services for 328 of the 359 clients listed on the PC list, and had personal contact with 151 of them while in PBS' employ.

With respect to the noncompete covenant, Strasheim testified that the employment agreement was important to PBS and that it would not have offered Rosno employment without it. Strasheim testified that he did not want Rosno taking any of PBS' clients and that it did not make any difference to him whether Rosno actually worked for or had personal contacts with them.

Following a bench trial, the trial court issued its order, finding in favor of Rosno on PBS' claim for damages for the alleged violation of the noncompete covenant. The court, finding that PBS failed to show that Rosno had substantial personal contacts with all of PBS' clients, held that the noncompete covenant was greater than was reasonably necessary. The employment agreement restricted Rosno from engaging in services with any of PBS' clients. With respect to Rosno's counterclaim, the trial court found against Rosno on his claim for payment of wages. The court found that when Rosno told Strasheim that he was leaving and would take PBS' clients with him, Rosno's actions constituted malfeasance. As such, the court concluded PBS' decision terminating Rosno's employment was within PBS' rights under the terms of the employment agreement. With respect to Rosno's claim for unpaid vacation and sick leave, the trial court found in Rosno's favor. The trial court found that based upon the employee handbook and PBS' past practices of paying out unused vacation and sick leave upon an employee's termination, Rosno was entitled to receive 32 hours of vacation pay and 72 hours of unused sick leave. The court found against Rosno on his claimed entitlement to a bonus, noting that the employment agreement did not require payment of a bonus, nor was Rosno promised one by PBS. PBS now appeals to this court.

## III. ASSIGNMENTS OF ERROR

PBS assigns on appeal six assignments of error, which can be consolidated to four. PBS contends, restated, that the trial court erred in (1) finding the noncompetition covenant greater than reasonably necessary to protect PBS and in failing to correctly apply the three-prong test used to determine the validity of a covenant not to compete, (2) finding Rosno was due any unused

vacation or sick leave pay, (3) failing to apply the covenant of good faith and fair dealing, and (4) failing to find that Rosno anticipatorily breached the noncompetition covenant.

Rosno assigns on cross-appeal, restated, that the trial court erred in (1) failing to find that PBS breached paragraph 6 of the employment agreement with Rosno by terminating the agreement immediately after Rosno gave his 90 days' advance notice pursuant to paragraph 6 and not awarding Rosno his unpaid salary, vacation pay, and sick leave pay during the 90-day notice period and (2) failing to award Rosno his promised $5,000 annual bonus.

## IV. STANDARD OF REVIEW

A suit for damages arising from breach of a contract presents an action at law. *Anderson Excavating v. SID No. 177,* 265 Neb. 61, 654 N.W.2d 376 (2002). In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly erroneous. *In re Trust Created by Martin,* 266 Neb. 353, 664 N.W.2d 923 (2003); *Anderson Excavating v. SID No. 177, supra.*

The interpretation of a contract involves a question of law, in connection with which an appellate court has an obligation to reach its conclusions independent of the determinations made by the court below. *Suburban Air Freight v. Aust,* 262 Neb. 908, 636 N.W.2d 629 (2001).

## V. ANALYSIS

### 1. PBS' APPEAL

#### (a) Noncompete Covenant

PBS contends on appeal that the noncompete covenant in Rosno's employment agreement was no greater than reasonably necessary to protect PBS' legitimate interest. The relevant provision of the covenant not to compete in this case provides: "[I]n the event of the termination of his employment, for whatever reason, [Rosno] shall not directly or indirectly solicit, contact or perform services for *any* of [PBS'] clients for his own benefit or as an officer, director, shareholder, partner, advisor, consultant or employee of any third party." (Emphasis supplied.)

In *Rosno I*, we stated:

> To determine whether a covenant not to compete is valid, a court must determine whether a restriction is reasonable in the sense that it is not injurious to the public, that it is not greater than is reasonably necessary to protect the employer in some legitimate interest, and that it is not unduly harsh and oppressive on the employee. *Moore* [*v. Eggers Consulting Co.*, 252 Neb. 396, 562 N.W.2d 534 (1997)]. There is no indication or claim that enforcement of the noncompete clause in Rosno's contract will be injurious to the public or that the restriction is "unduly harsh" as that expression is used in the cases. Accordingly, we focus our analysis on whether or not the restriction of the covenant is no greater than reasonably necessary to protect PBS' legitimate interest as alleged in the second amended petition.

> An employer has a legitimate business interest in protection against a former employee's competition by improper and unfair means, but is not entitled to protection against ordinary competition from a former employee. *Moore v. Eggers Consulting Co.*[, *supra*], citing *Vlasin v. Len Johnson & Co.*, 235 Neb. 450, 455 N.W.2d 772 (1990). In *Moore*, we stated: " ' "To distinguish between 'ordinary competition' and 'unfair competition,' courts and commentators have frequently focused on an employee's opportunity to appropriate the employer's goodwill by initiating personal contacts with the employer's customers. Where an employee has substantial personal contact with the employer's customers, develops goodwill with such customers, and siphons away the goodwill under circumstances where the goodwill properly belongs to the employer, the employee's resultant competition is unfair, and the employer has a legitimate need for protection against the employee's competition." ' " *Id.* at 401, 562 N.W.2d at 539, quoting *Boisen v. Petersen Flying Serv.*, 222 Neb. 239, 383 N.W.2d 29 (1986).

> . . . .

> In *Polly v. Ray D. Hilderman & Co.*, 225 Neb. 662, 668, 407 N.W.2d 751, 756 (1987), this court reviewed several cases involving noncompete covenants and stated the general rule that a covenant not to compete in an

employment contract "may be valid only if it restricts the former employee from working for or soliciting the former employer's clients or accounts with whom the former employee actually did business and has personal contact." In *Polly*, this court stated that generally, a noncompete covenant is more restrictive than reasonably necessary if it restricts an employee from working for or soliciting all of the former employer's clients or accounts, regardless of whether the former employee actually did business with and had personal contact with those clients. In *Polly*, this court reviewed *Dana F. Cole & Co. v. Byerly*, 211 Neb. 903, 320 N.W.2d 916 (1982), and observed that *Dana F. Cole & Co.*, by virtue of its facts, presented an exception to the general rule.

In *Dana F. Cole & Co., supra*, this court held that based on the evidence at trial, a covenant which restricted a former branch manager of an accounting firm from practicing accounting within 75 miles of the office he had managed was reasonable and enforceable. This court held that such a covenant was valid in light of evidence which showed that branch managers had personal relationships with clients served and that on the basis of past experience, the employer had the need to protect itself from the risk of a branch manager's taking clients with him or her when he or she left its employ.

In *Moore v. Eggers Consulting Co.*, 252 Neb. 396, 562 N.W.2d 534 (1997), this court affirmed the grant of an employee's motion for summary judgment on a breach of covenant not to compete claim, determining that the scope of the covenant not to compete in that case was greater than necessary to protect a personnel recruiting corporation's legitimate interests and, thus, was unenforceable. In *Moore*, this court repeated the general rule that a covenant not to compete may be valid only if it restricts the former employee from working for or soliciting the former employer's clients or accounts with whom the former employee actually did business and had personal contact. In *Moore*, the covenant involved precluded the employee from entering into business with anyone of whom he had

knowledge due to his employment with the corporation, rather than those clients of the corporation with whom the employee merely did business and had personal contact. In addition, the covenant in question precluded the employee from working in employment recruitment anywhere in the continental United States. In *Moore*, the summary judgment evidence showed that while with the employer, Moore worked primarily with clients of the employer in the Midwest, indicating that Moore had little personal contact with the employer's clients outside the Midwest. The employer failed to rebut the evidence of overbreadth or otherwise propose a rationale for such a broad restriction. The restriction was, thus, untenable.

*Rosno I*, 256 Neb. at 223-27, 589 N.W.2d at 831-33.

We continued, stating:

After reviewing PBS' second amended petition, and liberally construing it as we must, we conclude that PBS' second amended petition taken as a whole states a cause of action. In this regard, we note that PBS has alleged, inter alia, that Rosno has had substantial contact with virtually all of PBS' clients. The inferences of law and fact from the second amended petition are that Rosno is being restricted from working for or soliciting PBS' clients or accounts with whom Rosno actually did business and had personal contact and that in his employment contract the covenant not to compete with respect to all of PBS' clients could be enforceable.

*Id.* at 227, 589 N.W.2d at 833.

■ PBS contends in this appeal that in determining whether Rosno violated the covenant not to compete, we must look not only at Rosno's contacts with PBS' clients but also at the client information he acquired while employed with PBS. However, in *Rosno I*, citing to the rule in *Polly v. Ray D. Hilderman & Co.*, 225 Neb. 662, 407 N.W.2d 751 (1987), we held that a covenant not to compete is valid only if it restricts a former employee from soliciting those clients with whom the former employee actually did business and had personal contact. PBS contended that the noncompete covenant was valid and enforceable under

the facts as alleged in the petition. We limit PBS to the allegations made in its petition and require that it show that Rosno actually did business and had personal contact with "virtually all" of PBS' clients. See *American Fam. Mut. Ins. Co. v. Hadley*, 264 Neb. 435, 648 N.W.2d 769 (2002) (as general rule, appellate court disposes of case on theory presented in district court).

In its order, the trial court found that PBS failed to meet its burden of showing that Rosno had substantial personal contact with all of PBS' clients. Specifically, the trial court found that the evidence established, inter alia, that PBS admitted Rosno did not have substantial personal contact with those clients listed on the BO list. The trial court found that PBS was unable to definitively substantiate that Rosno had personal contact with all of the clients listed on the PC list. Accordingly, the trial court concluded that the noncompetition covenant of the employment agreement was greater than is reasonably necessary to protect PBS and is unenforceable. Based on our review of the record, we conclude that the trial court's findings are not clearly erroneous. This assignment of error is without merit. Because the noncompetition covenant is greater than reasonably necessary to protect PBS, PBS is not entitled to liquidated damages or any other relief on this basis.

(b) Payment of Vacation and Sick Leave

After the termination of Rosno's employment, PBS refused Rosno's request that he be paid his bonus as well as his earned but unused vacation or sick leave. Rosno's last payroll check stub indicated that Rosno had available 32 hours of vacation and 72 hours of sick leave. PBS argues that the trial court erred in finding that Rosno was entitled to his earned but unused vacation and sick leave pay.

The employment agreement provides, in pertinent part, as follows:

4. <u>Other Benefits</u>: . . . .

. . . .

In addition to the foregoing, Rosno shall receive three (3) weeks of paid vacation per year a[t] such time as may be reasonable given the professional and work related demands of the Employer during the year.

In addition to the foregoing, Rosno shall have the opportunity to participate in any retirement, health insurance or other employee benefit plan offered by the Employer to its employees generally.

PBS contends that the phrase "other employee benefit plan" found in paragraph 4 of the employment agreement does incorporate the provisions of the employee handbook but applies only to plans similar to retirement or health insurance plans, such as dental or vision insurance or profit-sharing plans available to PBS employees.

The employment agreement does not define "employee benefit plan." However, the Nebraska Wage Payment and Collection Act, under which the trial court awarded Rosno his unpaid vacation and sick leave pay, defines "fringe benefits" to include "sick and vacation leave plans, disability income protection plans, retirement, pension, or profit-sharing plans, health and accident benefit plans, and any other employee benefit plans." Neb. Rev. Stat. § 48-1229(3) (Reissue 1998). Thus, vacation and sick leave pay is characterized as an "employee benefit plan" under the terms of the Nebraska Wage Payment and Collection Act. We will refer to PBS' employee handbook to determine whether Rosno was entitled to receive his earned but unused vacation and sick leave pay.

A copy of PBS' employee handbook was offered and admitted into evidence. The provision of the employee handbook relating to vacation pay provides, in relevant part:

One week paid vacation will accrue after an employee has worked for one full year. No payment of vacation shall be payable for termination prior to the first year's full employment.

Two weeks paid vacation shall accrue after two full years' employment. No payment for vacation shall be payable for termination during the work year with the following exceptions:

1. If the full two week vacation period is due at termination, the vacation will be paid.

2. If over seven months of a work year after the first year have elapsed, and the termination is due to illness or pregnancy, one week will be paid.

3. If an employee is terminated and the employee has seven months of the second or later years, the employee will be paid one week termination pay.

No accrual on voluntary termination.

. . . .

You may receive regular pay rate for any unused vacation. The provision of the employee handbook regarding sick pay, provides, "Any sick leave not used will be paid to the employee at the time of termination."

■ Evidence of custom is admissible when there is a conflict as to the terms of the contract to explain the meaning of the words or phrases used, or where the contract is silent as to certain points which may be inherent in the nature of the contract. *Coppi v. West Am. Ins. Co.*, 247 Neb. 1, 524 N.W.2d 804 (1994). Because neither the employment agreement nor the employee handbook is ambiguous, we need not consider the parties' respective evidence regarding PBS' current practice relative to payment of vacation and sick leave.

Accordingly, construing the terms of the employee handbook in conjunction with the employment agreement, we conclude that the trial court properly found that Rosno was entitled to his earned but unused vacation and sick leave pay. The employee handbook expressly states that any unused sick leave will be paid out upon termination. Moreover, Rosno began his employment with PBS in October 1992 and was terminated in November 1995. Rosno's termination falls within the third listed exception with regard to vacation pay in the employee handbook, and as such, he is entitled to receive his accrued vacation pay.

(c) Duty of Good Faith and Anticipatory Breach

■ PBS next contends that the trial court erred in failing to find that Rosno breached his duty of good faith and fair dealing and anticipatorily breached the noncompetition covenant. PBS did not raise either of these arguments in its operative petition, nor did it argue these points to the trial court. Accordingly, we need not address them. See, *Mason v. City of Lincoln*, 266 Neb. 399, 665 N.W.2d 600 (2003); *Capitol City Telephone v. Nebraska Dept. of Rev.*, 264 Neb. 515, 650 N.W.2d 467 (2002) (appellate

court will not consider issue on appeal that was not passed upon by trial court).

## 2. ROSNO'S CROSS-APPEAL

### (a) Unpaid Salary and Vacation and Sick Leave Pay During 90-Day Notice Period

Rosno contends on cross-appeal that the trial court erred in failing to find that PBS breached paragraph 6 of the employment agreement with Rosno by terminating the agreement immediately after Rosno gave his 90 days' advance notice pursuant to paragraph 6 and in not awarding Rosno his unpaid salary and vacation and sick leave pay during the 90-day notice period.

The relevant termination provisions in the employment agreement provide:

> Additionally, Employer may terminate this Agreement and Rosno's employment by Employer at any time, without notice to Rosno for fraud, misrepresentation, theft, malfeasance, or upon the initiation by the Board of Accountancy of any proceedings to revoke or modify the permit to practice public accounting pursuant to the laws of the State of Nebraska.
>
> . . . .
>
> Rosno may terminate this Agreement, and Rosno's employment hereunder at any time, for any reason, upon ninety (90) days advanced written notice to Employer.

According to the terms of the employment agreement, Rosno was required to give 90 days' notice of termination. During this time, he would be entitled to any earned salary as well as vacation and sick leave accrued during that time. However, Rosno would not be entitled to receive his salary and earned vacation and sick leave during that 90-day period if PBS properly terminated Rosno for "fraud, misrepresentation, theft, malfeasance, or upon the initiation by the Board of Accountancy of any proceedings to revoke or modify the permit to practice public accounting pursuant to the laws of the State of Nebraska." Thus, we must determine whether Rosno committed any of the aforementioned acts.

The Restatement (Second) of Agency § 387 at 201 (1958) provides that "[u]nless otherwise agreed, an agent is subject to a

duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." This general rule forbids the doing of acts in competition with the principal and taking unfair advantage of the agent's position in the use of information or things acquired by him because of his position as an agent. *Id.*, comments *a.* and *b.*

 The Restatement, *supra*, § 393 at 216, further provides that "[u]nless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency." Comment *e.*, § 393 at 218, provides, in relevant part:

> *e. Preparation for competition after termination of agency.* After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed. . . . Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete. *He is not, however, entitled to solicit customers for such rival business before the end of his employment* nor can he properly do other similar acts in direct competition with the employer's business.

(Emphasis supplied.)

The trial court found that when Rosno told Strasheim that he was resigning and would take PBS' clients with him, Rosno's actions constituted malfeasance. Indeed, the record reflects that when submitting his termination of employment notice, Rosno told Strasheim that "I'm going to ask anybody I want to follow me to my accounting firm and leave PBS" and that he was not going to honor the noncompetition covenant. Rosno admitted during cross-examination that his intention, had he been permitted to continue working for PBS during his 90-day notice period, was to continue working for PBS while simultaneously taking PBS' clients. This was in direct contravention of his duty of loyalty to PBS. Based on these facts, combined with Strasheim's testimony that Rosno's was the most hostile resignation he had ever experienced, it would have been reasonable for PBS to

conclude that at the time Rosno submitted his termination of employment notice, he intended to and would have solicited PBS' clients during the 90-day notice period. Rosno's expressed intent to breach his duty of loyalty constitutes malfeasance under the terms of the employment agreement. Accordingly, we affirm the trial court's order declining to award Rosno his salary and vacation and sick leave pay that would have accrued during his 90-day notice period.

### (b) Unpaid Bonus

With respect to bonuses paid to Rosno while employed with PBS, Strasheim testified that Rosno received a bonus on October 15, 1993, after his first year with PBS and again on December 31, 1994, after his second year with PBS. Thereafter, Rosno did not receive any further bonuses while employed with PBS. Rosno testified that when he met with another principal of PBS, Strasheim's brother, in the summer of 1995 to discuss Rosno's salary review, Rosno asked about his bonus. According to Rosno, Strasheim's brother responded by telling Rosno he would get the bonus in December. On cross-examination, Rosno testified that he was also told he had "earned" the bonus, but admitted he never received anything in writing stating he was going to receive a bonus for that year. Rosno also admitted that effective August 1995, he received a salary raise in an amount similar to his bonuses received in October 1993 and December 1994.

Rosno contends that the trial court erred in failing to award Rosno his promised $5,000 annual bonus. The relevant section of the employment agreement provides: "3. Salary and Bonuses: . . . Employer *may* pay Rosno a bonus at any time during the term of the Agreement. However, Rosno shall be paid a bonus of $5,000.00 after Rosno's first year of employment." (Emphasis supplied.)

According to the terms of the employment agreement, PBS was required to pay Rosno a bonus during his first year of employment only. PBS was not obligated to pay Rosno a bonus in any other year. While Rosno contends that Strasheim's brother orally promised him a bonus, the employment agreement requires that any changes to the employment agreement be made in writing. Rosno admitted that he did not receive anything in writing

from PBS confirming that he would receive a bonus in 1995. Accordingly, this assignment of error is without merit.

## VI. CONCLUSION

We conclude that the covenant not to compete in the employment agreement is greater than is reasonably necessary to protect PBS and is unenforceable. We further conclude that Rosno is entitled to receive his vacation and sick leave pay earned but unused as of the date of his termination of employment on November 13, 1995, but is not entitled to his salary or vacation and sick leave pay that would have accrued during the 90-day notice period. Finally, we conclude that Rosno is not entitled to a bonus.

AFFIRMED.